**DODGE STREET BUILDING CORPORATION, a Nebraska corporation,**

v.

**The UNITED STATES.**

No. 325–61.

United States Court of Claims.
Feb. 19, 1965.

Laramore, J., dissented.

22. 41 U.S.C. §§ 321, 322.

642

Lyle E. Strom, Omaha, Neb., for plaintiff, James J. Fitzgerald, Jr., Omaha, Neb., of counsel.

Herbert Pittle, Washington, D. C., with whom was Asst. Atty. Gen. Ramsey Clark, Washington, D. C., for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

COWEN, Chief Judge.

In 1924 Elks Lodge No. 1817 (then known as Lodge No. 39) of Omaha, Nebraska, erected an 8-story, concrete and brick structure at 18th and Dodge Street in Omaha. The building was constructed in a manner to facilitate various uses by the lodge. The seventh and eighth floors were combined for use as a ballroom and club; the fourth, fifth, and sixth floors were designed for and devoted to hotel use, having a total of 105 rooms—35 on each floor. Each room on these floors contained a private lavatory and toilet. Twelve of the rooms on each floor had full private baths. For the remaining 23 rooms on each of these floors there was one common shower room, consisting of four shower stalls. The administrative offices of the lodge and some clubrooms occupied the third floor. The first floor has been rented to various store-type operations, including a restaurant, a bar, a bowling alley, and some small retail shops. Since 1950 the Omaha Chamber of Commerce has leased the entire second floor.

In 1950 the lodge, which to that time had been the owner and operator of the building, organized the Dodge Street Corporation, plaintiff herein, to take over that ownership and operation. All of the plaintiff's outstanding stock is held by the lodge.

Early in 1953 defendant leased the fourth, fifth, and sixth floors from plaintiff for use by an agency of defendant as office space. In order to so use these floors defendant made extensive additions, alterations, and repairs. The changes included removal, addition and/or alteration of partitions, floors, walls, ceilings, doors, windows, hardware, millwork, plumbing, electrical wiring, light fixtures, switches, outlets, and electrical panels. All three floors were painted and the bedroom-type lighting fixtures were replaced by large ceiling fluorescent fixtures. Carpeting was replaced by asphalt tile. The shower rooms were converted to restrooms for men and women by removing the old plumbing fixtures and installing new plumbing equipment. The outmoded electrical power supply and systems were transformed to a system that was adequate for either hotel or office use. In performing this work, the defendant expended a total of $101,946.-69.

A condition survey made jointly by representatives of both parties prior to defendant's conversion showed that the

paper on the walls of the hotel rooms was in poor to good condition and that the walls of the bathroom, janitor's closets, and supply closets were in poor condition. The carpets on the floor were in fair condition and the ceiling of the rooms in good condition. The doors were found to be in good condition but the wood sash windows were loose. The plumbing fixtures were cracked and the enamel worn. In general, the woodwork was in fair condition while the halls, stairways, and elevators were in good condition.

Included in the lease, which provided for an annual rental of $67,000, was a clause obligating the defendant upon termination of the lease to restore the premises to the condition existing at the beginning of the lease, except for ordinary wear and tear and damages by the elements or circumstances beyond the Government's control. A special proviso limited the restoration to partitions, plumbing and electrical wiring at the places indicated on drawings of the floor plans attached to the lease as exhibits.

By supplemental agreement of August 1953, the restoration provisions of paragraph 8 of the original lease were modified as follows:

"The Lessor agrees that should the Government make changes in or additions to the premises by construction and installing for its use general toilet room facilities for and located on the 4th, 5th and 6th floors, that the Government, at the termination of this lease, will not be required to restore that part of the demised premises used for said general toilet room facilities, provided the Government elects not to remove said general toilet room facilities at or before the expiration of this lease so that said general toilet room facilities will remain as provided and installed and shall become the property of the Lessor when this lease is terminated. The Lessor, in consideration for the Government not removing said general toilet room facilities, further agrees not to require the Government to restore any plumbing from wherever removed, if any, on the 4th, 5th and 6th floors, provided further, that the word "plumbing" as used in paragraph 8 and herein is defined to mean and include all water and sewage pipes, toilet room, bath room and shower room fixtures and installations, partitions and floorings presently installed in, and used in conjunction with and comprising the toilet rooms, bath rooms and shower rooms. The provisions of this paragraph are notwithstanding the provisions of paragrah 8."

Defendant occupied the leased space until October 15, 1960, at which time it vacated the premises pursuant to earlier written notice to the plaintiff. Prior to that date, and after defendant had given its notice to terminate, plaintiff had requested that the defendant restore the premises in accordance with the lease and the supplements thereto. After an exchange of letters and some negotiating, plaintiff furnished defendant with an itemized bill of $120,560 as its claimed restoration costs. Defendant replied that it would not restore the premises, since its appraisal had shown that the market value of the property in its condition at the termination of the lease exceeded the value of the property if restored in accordance with the covenants of the lease as supplemented.

After a denial of its claim by the General Services Administration on June 30, 1960, plaintiff brought this suit for breach of the restoration clause in the 1953 lease, as amended by the supplemental agreement. Plaintiff now claims that defendant's share of the cost of the restoration is $121,326.

■■■■ The Trial Commissioner correctly found that, as a result of the amendment of the lease contract, the Government's obligation to restore the premises was limited to the partitions (excluding those around the former bathrooms) and the electrical wiring on the fourth, fifth, and sixth floors. After considering the conflicting evidence on the

question, the Commissioner determined that the fair and reasonable cost of making such restoration was $47,243. The cost of restoration is not, however, the measure of plaintiff's damage. In an action for breach of contract, as opposed to a suit sounding in specific performance, the lessor is entitled only to the damages that were caused to the property by the failure to restore. Where the expense of restoration exceeds the diminution in the market value of the property caused by the lessee's nonperformance, the diminution in fair market value is the proper measure of damages. Spitzel v. United States, 146 Ct.Cl. 399. Furthermore, if the fair market value of the property is greater in its unrestored condition than it would be if restored in accordance with the covenants of the lease contract, the lessor has sustained no damage and is entitled to recover nothing. Realty Associates, Inc. v. United States, 138 F. Supp. 875, 134 Ct.Cl. 167.

Plaintiff has tried this case upon the theory that the highest and best use of the leased premises is for hotel use and has sought, by expert testimony, to establish that if the property were completely restored to its 1953 condition, with hotel rooms on the fourth, fifth, and sixth floors, the fair market value would exceed its value in the condition that existed upon the termination of the lease by an amount greater than plaintiff's claimed costs of restoration.

There are, however, several obstacles to plaintiff's right to recover under the facts of this case.

First, it is clear that the Government did not obligate itself to reconvert the fourth, fifth, and sixth floors to hotel rooms as they existed in 1953 when the lease was executed. It is conceded that if the Government had elected to restore the premises in full compliance with the provisions of the agreement, the fourth, fifth, and sixth floors would not have been usable for hotel purposes. A reconversion of the space to hotel rooms would have required the installation of pipes, plumbing fixtures and partitions for private bathrooms, plus other changes beyond the scope of defendant's covenant to restore.

Second, the Trial Commissioner, after hearing and considering the widely varying testimony of the experts called by the parties regarding the fair market value of the building in various stages of restoration, as well as its highest and best use at the time the lease was terminated, has rejected plaintiff's evidence in favor of that offered by the defendant. The Commissioner found that, from the record as a whole, the following conclusions are warranted:

"(a) As of the date the defendant vacated the premises, i. e., October 15, 1960, the highest and best use of the Elks Building, with the interior thereof in the same condition then existing, was for general office use.

"(b) Assuming that the fourth, fifth, and sixth floors of the building were restored to their condition as of June 1953, the highest and best use of the Elks Building at October 15, 1960, would have been to convert the said floors to offices and lease the same for general office use.

"(c) As of October 15, 1960, the fair market value of the building in its then condition together with the land on which it stood approximated $560,000.

"(d) Assuming that the fourth, fifth, and sixth floors of the building had been restored to their condition in June 1953 (except for bathrooms, plumbing, and bathroom partitions), the fair market value of the building and land would have been approximately $500,000, as of October 15, 1960."

Under our Rule 66 the findings of the Commissioner are presumed to be correct because of his opportunity to hear the witnesses, to evaluate their credibility, and to determine the weight to be accorded to their testimony. To overcome this presumption, plaintiff must make a strong affirmative showing to the contrary. Wilson v. United States, 151 Ct.Cl. 271; Davis v. United States, Ct.

Cl., 179–59, decided February 14, 1964. Cf., Toronto, Hamilton and Buffalo Nav. Co. v. United States, 88 F.Supp. 1016, 116 Ct.Cl. 184, as to the presumption accorded to a finding made by the trier of the facts where there is a conflict in the testimony of expert witnesses. After a review of the record, we are satisfied that the Commissioner's findings are amply supported by the evidence. Furthermore, as we shall indicate below, we are convinced he adopted the only course that was available to him in the light of the proof presented by the parties.

■ , Third, plaintiff failed to offer any evidence on the measure of damages which we have found to be applicable to the facts of this case. Under the rule announced in Realty Associates, Inc. v. United States, supra, and stated at the outset of this opinion, it was incumbent upon plaintiff to establish by a preponderance of the evidence that the fair market value of the building in the condition in which defendant had covenanted to restore it, was greater than its fair market value in an unrestored state at the termination of the lease. Each of the two expert appraisers called by the plaintiff gave his opinion as to what the fair market value of the building would have been if the fourth, fifth, and sixth floors had been restored to the condition existing. in 1953, including the private bathrooms and other changes required to reconvert the three floors for hotel use as in the prior period. Each also stated his opinion as to the fair market value of the premises in an unrestored state. However, neither ventured an opinion as to what the fair market value would have been if defendant had restored it in the manner required by the covenants of the lease contract. Instead, each declared that if the reconversion was so limited, he could not value the property at all, or that such a restoration would add nothing to the market value of the property in its condition when the premises were surrendered. Defendant offered the only evidence as to the fair market value of the premises if they had been restored in the manner required by the provisions of the lease contract; plaintiff has not contradicted this evidence; our Trial Commissioner has accepted defendant's evidence, and we have adopted his findings.

As the record has revealed, it makes no difference whether we find that the fair and reasonable cost of restoration was $121,326, as plaintiff contends, or $47,243, as the Trial Commissioner has found. The expenditure of either amount for restoration would have the deleterious effect of diminishing the present market value of the property.

As previously stated, defendant expended $101,946.69 in alterations and improvements which became the property of plaintiff upon the termination of the lease. The only pertinent evidence before us shows that at the time defendant vacated the premises, the fair market value of the property was approximately $60,000 in excess of what its fair market value would have been if defendant had elected to restore the fourth, fifth, and sixth floors in the manner specified in the amended lease contract.

It follows from what we have said that plaintiff is not entitled to recover and its petition is dismissed.

LARAMORE, Judge (dissenting):

In my opinion, under the majority's holding, the government's obligation under a "partial restoration" provision would never be enforceable. This result would seem to always follow, since the fair market value of the subject property would necessarily decrease when only partially restored to its prior condition. A building in such a stage of completion cannot possibly be productive since, as in this case, it can be used neither as an office building nor as a hotel. This is especially true here, since the valuation of rental property is universally based on its rate of return. The majority applies our holdings in the Spitzel and Realty Associates decisions, supra, as the proper measure of damages to the instant case. However, those cases involved provisions for complete restoration of the property. Although I do not question their correctness, I believe they should not be applied

to instances where the government's obligation under the lease contract is to partially restore the premises to its prior condition. These decisions are exceptions to the general rule governing damages for a breach of the covenant in a lease to restore the premises to its prior condition. They result from unusual circumstances which are not present in the instant case. In Spitzel the property could not be economically restored since it involved complicated dedudding operations; while in Realty Associates, what were once unproductive buildings in their prior condition became valuable rental property as a result of improvements made by the government. For these reasons, I think that the general rule should be applied here and plaintiff should be entitled to recover the costs of partial restoration as found by our commissioner.